# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## (Alexandria Division)

| | |
|---|---|
| JON E. DAVIS<br>480 Campus Drive, Apartment 202<br>Stafford, Virginia 22554<br><br>    Plaintiff,<br><br>        v.<br><br>APPLE FEDERAL CREDIT UNION<br>4097 Monument Corner Drive<br>Fairfax, Virginia 22030<br><br>Serve: Commonwealth of Virginia<br>         State Corporation Commission<br>         1300 East Main Street<br>         Tyler Building, 1st Floor<br>         Richmond, Virginia 23219<br><br>    Defendant. | Civil Action No. _____ |

## **COMPLAINT**

COMES NOW THE PLAINTIFF, JON E. DAVIS, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendant, APPLE FEDERAL CREDIT UNION, and in support of such motion alleges and avers as follows:

## **NATURE OF ACTION**

This action states a claim for discrimination and hostile work environment based on Plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., and in violation of and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

## PARTIES

1. Plaintiff Jon E. Davis ("Mr. Davis") is, and was at all times relevant hereto, a resident and citizen of Stafford County in the Commonwealth of Virginia, and at all times relevant hereto, was employed by the Defendant in Fairfax County, in this judicial district.

2. Defendant Apple Federal Credit Union ("AFCU"), Mr. Davis' employer and the entity shown on his W-2s, was not found through a business entity search of the Virginia State Corporation Commission. The entity Apple Federal Credit Union Foundation is registered and shares the corporate address listed on Mr. Davis' W2s, but that entity is now "inactive." However, Defendant AFCU is present in and maintains numerous offices in Fairfax County, in this judicial district.

3. Mr. Davis was an "employee" of AFCU within the meaning of 42 U.S.C. § 2000e(f).

4. AFCU is an "employer" within the meaning of 42 U.S.C. §2000e(b).

5. AFCU has had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and was Mr. Davis' "employer" within the meaning of Va. Code § 2.2-3905.

## JURISDICTION AND VENUE

6. The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

7. The causes of action alleged in this action arose in this judicial district, in Fairfax County, in the Commonwealth of Virginia.

8. Mr. Davis is, and was at all times relevant hereto, a resident and citizen of this judicial district and at all times relevant hereto, was employed by the Defendant in this judicial district.

9. Defendant is present in and conducts business in this judicial district, and the acts complained of herein occurred in this judicial district.  Therefore, the Defendant is subject to the personal jurisdiction of this Court.

10. The unlawful employment practices in this case were committed in this judicial district, and Mr. Davis would still be employed in this judicial district, continuing to work for the Defendant, but for the Defendant's unlawful practices.

11. This Court has jurisdiction over Mr. Davis' claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. and under Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

12. Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

14. Jurisdiction and venue are proper in this Court.

**PROCEDURAL STATUS**

15. Mr. Davis timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("E.E.O.C.") on October 27, 2021, an Amended Charge on May 4, 2022, and a Complaint of Discrimination with the with the Office of Attorney General - Virginia Office of Civil Rights, on May 3, 2022.  Pursuant to the Worksharing Agreement

between the two agencies, the OAG ceded investigative authority of Mr. Davis' Complaint to the E.E.O.C.

16. The E.E.O.C. issued Mr. Davis a Right to Sue dated September 26, 2022.

17. This action is timely filed.

## FACTUAL BACKGROUND

18. Mr. Davis is an African-American/Black male.

19. Mr. Davis began his employment as a Financial Advisor with Apple Federal Credit Union ("AFCU") on January 16, 2016. His immediate supervisor was Jeffrey Callan, VP of the Apple Financial Solutions Department.

20. Prior to becoming employed, Mr. Davis spoke to Mr. Callan about the conditions he would require in order to accept the position. That included being able to work away from the branches on occasion, since Mr. Davis was bringing clients with him to AFCU/AFS, and those clients were accustomed to Mr. Davis meeting them at the client's/ prospect's residence or place of business. Being able to continue meeting with his clients as he had before transitioning them to AFCU/AFS was a necessity for Mr. Davis. Mr. Davis assured Mr. Callan that this would not interfere with his being available to AFCU members seeking his services. Mr. Callan agreed, and based on this agreement, Mr. Davis accepted the offer of employment.

21. During his employment, Mr. Davis was treated differently than his Caucasian male colleague based on his race.

22. From the outset, despite his request for an available territory that would not cause him to be isolated from the rest of the team or exclude him from having an office at headquarters, that is exactly what happened. Mr. Davis worked out of the Springfield branch office, while the rest of his team, and Mr. Callan, worked at the headquarters in Fairfax. Mr.

Callan never came out to any of his branches or conducted any branch training for Mr. Davis during his employment as he did for his Caucasian/non-African-American colleagues.

23. Prior to the outbreak of the COVID-19 pandemic, Mr. Davis asked on several occasions for an RSA token, which allows employees to work remotely from their computers. Mr. Callan always refused Mr. Davis' requests even though his AFS (Caucasian/non-African-American) colleagues were given access to one.

24. Mr. Callan continuously pressured Mr. Davis about production numbers despite the fact that each year (prior to the pandemic), Mr. Davis finished as one of the top Advisors.

25. Mr. Callan repeatedly questioned and micro-managed Mr. Davis' work, even when Mr. Davis was doing it correctly and following Mr. Callan's explicit directions.  Mr. Davis did not observe Mr. Callan treating his Caucasian/non-African-American colleagues in a similar manner.

26. Mr. Callan took almost two years to pronounce Mr. Davis' name correctly, and often "accidently" left his name off of handouts/agendas we received during monthly department meetings.

27. Mr. Callan questioned Mr. Davis when he requested sick time, forcing Mr. Davis to share personal details with Mr. Callan.  Mr. Callan gave Mr. Davis a hard time about taking sporadic time off during the six months his mother was hospitalized before her 2018 passing.

28. In or around July 2019, Mr. Davis was racially profiled when a false complaint of alleged harassment was made against him.  AFCU did not bother to conduct a proper investigation into the false allegations, and Mr. Davis received an unwarranted and unjustified write-up in his personnel file.  Mr. Davis was not given the chance to defend himself and disprove the allegations, which were taken as truth, with no investigation, which was contrary

to company policy and protocol. Mr. Davis' supervisor never even asked him if the allegations were true. Mr. Davis' accuser, on the other hand, was granted an audience with both his supervisor Andy Grimm, AFCU President and CEO, and Jon Guepe, another AFCU officer.

29. During a meeting on July 11, 2019, Mr. Davis was threatened and embarrassed in the presence of Odis Graham, the Director of Property and Casualty Insurance for Apple Financial Services. It was during the meeting that Mr. Callan first notified Mr. Davis of the allegations against him (by being presented with a document to sign that alluded to some "misconduct" on his part), but Mr. Davis was not provided any specific details. Mr. Callan threatened that if Mr. Davis did not meet the minimum production requirements by the end of the month that he would need to look for another job. It was humiliating and demeaning to Mr. Davis to have this false accusation disclosed to him in the presence of Mr. Graham, and Mr. Callan's choice to do so in this manner was intentional, and meant to humiliate and demean Mr. Davis in the presence of Mr. Graham.

30. Mr. Callan further embarrassed and disparaged Mr. Davis when he began discussing Mr. Davis' personal finances in the presence of Odis Graham, making specific reference to Mr. Davis' AFCU credit card, commenting that "they" did not know how Mr. Davis was able to support himself.

31. Mr. Davis is aware that at least one other Financial Advisor (Robert Gascon, a white male) who went an entire year without meeting the minimum production requirements, but was not similarly threatened, and was not terminated.

32. In addition, Mr. Gascon was provided support from Mr. Callan that was never extended to Mr. Davis. Mr. Callan encouraged Mr. Gascon and another Advisor (also a white male) to pursue further certifications in the industry. In sharp contrast, Mr. Davis approached

Mr. Callan several times about wanting to do so, but Mr. Callan just ignored Mr. Davis' requests for assistance and discouraged him from pursuing further certifications.

33. Mr. Davis was one of Mr. Callan's top producers (and Mr. Gascon was not), was more experienced than Mr. Gascon and the other Advisor (combined), yet Mr. Callan still treated Mr. Gascon and others (who were not African-American/Black) in a more favorable manner.

34. Mr. Davis immediately objected to the lack of a proper investigation into the complaint against him, in the presence of Odis Graham. Mr. Davis reiterated this objection during his meeting with Mr. Callan and Kendra Williams, the-then Director of Human Resources in July 2019.

35. Mr. Davis sent an email to Mr. Callan, reiterating his objections to the false accusations and the lack of any investigation into the truth of the matter. After that, Mr. Callan started questioning whether Mr. Davis had properly completed his work assignments, even though evidence clearly showed Mr. Davis had done so.

36. Prior to this, Mr. Davis had an exemplary record of professionalism. Prior to Mr. Callan's threat, Mr. Davis had always finished as one of the top three Advisors in terms of production for each full year of his tenure in the department.

37. During the COVID-19 pandemic, Mr. Callan held weekly department meetings with the Financial Advisors via Microsoft Teams. On most occasions, it is apparent that many of Mr. Davis' colleagues (and Mr. Davis) were working remotely. No one ever brought up the requirement for authorization to do so, and Mr. Callan never mentioned it, even though he could tell that Mr. Davis (and many of his colleagues) were working remotely. Mr. Davis is not

aware of any Financial Advisors who sought formal authorization to work remotely prior to his termination.

38. On March 3, 2020, Mr. Callan sent an email to his team, asking who had "a working RSA token." The token allows employees to log in to AFCU from home (or any secured Wi-Fi location). Mr. Callan's email confirmed that other members of the AFS team were given RSA tokens to work remotely, but Mr. Davis was not, even when he requested one to enable him to work remotely while attending a work-related conference, where he was trying to conduct business for and with members.

39. In early 2021, during a virtual AFS Department meetings, Mr. Davis alerted Mr. Callan that the security licensing fee for Mr. Davis' Tennessee license was coming due. On information and belief, Mr. Callan instructed CUSO Financial Services, L.P. ("CFS"), a registered broker-dealer partnered with AFCU, not to pay the fee for Mr. Davis' Tennessee license, even though CFS always paid such fees on behalf of an AFS Financial Advisors. (The fees were never paid, and Mr. Davis ultimately had to reimburse a family member $656 for the license fees plus penalties when that individual's bank account was accessed without permission because Mr. Davis' name was secondary on the account.) Notably, Mr. Callan is the one who approved Mr. Davis' request for licensing in Tennessee which resulted in Mr. Davis' Tennessee license becoming active in January of 2021, which also demonstrates Mr. Callan's awareness that Mr. Davis worked away from his branch on occasion.

40. On March 3, 2021, Mr. Davis received his 2020 performance annual evaluation - the last one he would receive prior to his termination. In the summary, Mr. Callan wrote:

> Jon is well regarded by employees seeking investment advice. He believes in coaching the branch employees to look for referral opportunities. He communicates with credibility and confidence. He works effectively with others. JD demonstrates strong customer service skills. He is open to feedback. He just celebrates [sic] his five year work anniversary.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> JD is a talented financial advisor.  He was the top producing advisor during 2019.  He demonstrates strong interpersonal skills.  JD is displays [sic] a calm, even temperament.

41.     In or around February 2020, Karyn Burke ("Ms. Burke") replaced Kendra Williams as the AVP of People and Culture/HR.  Sometime after she started, she reached out to Mr. Davis via email, about what had transpired between Mr. Davis and Mr. Callan in July 2019, as described above.  Mr. Davis was surprised by the communication, since he had not yet even met with Ms. Burke at this point, and because the events transpired prior to her hiring.  Mr. Davis responded by email, asking what she wanted to discuss about the incident, which was documented in his employee file, but she never responded.

42.     On July 15, 2021, Mr. Davis was summoned to headquarters, to a meeting in Mr. Callan's office.  Ms. Burke was already present when Mr. Davis arrived.

43.     During the meeting, Mr. Davis was told it was "company policy" that pre-authorization was required to work from home.  Mr. Davis has never been provided with a copy of the policy that existed prior to July 15, 2021, despite his requests.  Mr. Callan was fully aware that Mr. Davis, and others, had been working from home since the Covid-19 pandemic.

44.     Nevertheless, Mr. Davis was placed on "temporary administrative leave" pending an investigation.  Mr. Davis was not told what was being investigated, or who would be interviewed in connection with the investigation.  Mr. Davis was shocked and completely taken aback by this abrupt turn of events.

45.     Notably, on July 15, 2021, just prior to his meeting with Mr. Callan and Karen Burke, Mr. Callan sent an email to all Financial Advisors that "effective immediately" they were required to work from their assigned branch offices, Monday – Friday, during normal branch

operating hours.  If the policy of needing an authorization to work remotely was common knowledge as AFCU alleges, Mr. Callan would not have had any reason to send such an email.

46. Mr. Davis was the only Financial Advisor terminated for working remotely without authorization.

47. On July 20, 2021, Mr. Davis received a "Termination of Employment" Memorandum from Mr. Callan, via email.

48. The termination letter contained false and inaccurate statements, including that AFCU had "discovered" during the meeting on July 15 that Mr. Davis had been working remotely, from Ohio, for the time period July 6-14, 2021.  Mr. Davis attempted to tell Mr. Callan that the majority of the time he works remotely he is working from his home, but Mr. Callan cut him off and asked if Mr. Davis had been in Ohio (at all).  Mr. Callan did not listen to Mr. Davis' response.  In reality, Mr. Davis had been in Ohio for the holiday weekend, and only worked remotely from Ohio five of the days in question.  In addition, Joyce Brooks, AFC Client Relationship Manager, was notified Mr. Davis was working remotely, and his calendar (which Mr. Callan had access to) also indicated Mr. Davis would be working remotely, as well as the days he was taking off.

49. Mr. Callan always had direct access to Mr. Davis' calendar, which is shared with Mr. Callan electronically.  Prior to this, despite remote workdays being scheduled on Mr. Davis' calendar, Mr. Callan never asked why Mr. Davis had not requested his authorization to work remotely.  When Mr. Callan summoned Mr. Davis to headquarters to meet with him and Ms. Burke on July15, Mr. Callan acknowledged seeing Mr. Davis' schedule.

50. Mr. Davis told Mr. Callan that he had worked remotely in other locations as well (Florida, New Jersey, New York), since he has clients in these locations and had never before

been told he needed prior authorization from Mr. Callan in order to do so. Since both his company laptop and his cell phone disclose his location, it was clear Mr. Davis was not attempting to keep this information secret. In addition, Mr. Davis consulted with the IT Help Desk while working remotely from Ohio, and he made no attempt to conceal that ticket which clearly shows he was working remotely, as the IT Technician was granted permission to share Mr. Davis' remote screen.

51. After his termination, Mr. Davis was not allowed to take the client files with him that he had brought with him to AFCU as his personal book of business. At least two of these clients contacted Mr. Callan after Mr. Davis' termination to ask what had happened, why Mr. Davis was no longer their Financial Advisor, and why they had not been contacted. These clients both pointed out that they were Mr. Davis' personal investment clients, and not clients through AFCU. Mr. Callan told these clients that he was responsible for notifying all of Mr. Davis' clients that Mr. Davis was no longer employed at AFCU, and that he would be making the calls.

52. Mr. Davis learned from at least one other of his personal investment clients that no such call was ever received. Mr. Callan's actions towards Mr. Davis' clients were intended to, and did, give the impression that Mr. Davis had been fired involuntarily, implying misconduct, so that AFCU could retain his clients for its own benefit.

53. Mr. Davis was also denied unemployment benefits because of the false narrative given to the Virginia Employment Commission – that Mr. Davis was fired for misconduct.

54. Mr. Davis was fired less than a week after being abruptly placed on administrative leaving, pending an alleged "investigation." Mr. Davis was never counseled, placed on a performance improvement plan, or otherwise given any chance to correct the conduct which was

the alleged reason for his termination. Mr. Davis was not told that going forward he would need an authorization from Mr. Callan to work remotely. Mr. Davis was simply fired.

55. Mr. Davis is still in a state of shock and disbelief at how he was treated by AFCU, which was entirely unjustified by his conduct and performance. .

**COUNT ONE -**
**DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING**
**THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII**

56. The allegations of the foregoing paragraphs are incorporated as if realleged herein.

57. Defendant discriminated against Mr. Davis, treated Mr. Davis in a disparate manner, and subjected Mr. Davis to a hostile work environment because of his race (African-American/Black).

58. Acts of discrimination include:

- Ignoring Mr. Davis' request for a territory that would not cause him to be isolated from the rest of the team or exclude him from having an office at headquarters, and instead, isolating him from the rest of the team and not allowing him to have an office at headquarters;

- AFCU and Mr. Callan failing to conduct any branch training for Mr. Davis as was done for his Caucasian/non-African-American colleagues;

- Refusing Mr. Davis' requests for an RSA token despite the fact that his Caucasian/non-African-American colleagues were given access to RSA tokens;

- Mr. Callan continuously pressuring Mr. Davis about production numbers despite the fact that each year (prior to the pandemic) Mr. Davis finished as one of the top Advisors;

- Mr. Callan repeatedly questioning and micro-managing Mr. Davis' work, even when Mr. Davis was doing it correctly and following Mr. Callan's explicit directions;

- Mr. Callan taking almost two years to pronounce Mr. Davis' name correctly;

- Mr. Callan "accidently" leaving Mr. Davis' name off of handouts/agendas from monthly department meetings;

- Mr. Callan questioning Mr. Davis when Mr. Davis requested sick time, forcing Mr. Davis to share personal details with Mr. Callan;

- Mr. Callan giving Mr. Davis a hard time about taking sporadic time off during the six months his mother was hospitalized before her 2018 passing;

- AFCU failing to follow company policy and protocol to conduct a proper investigation into a false complaint of harassment against Mr. Davis, which was based on racial profiling, and subjecting him to an unwarranted and unjustified write-up in his personnel file;

- Not allowing Mr. Davis a chance to defend himself and disprove the false allegations, which were taken as truth, with no investigation and without interviewing Mr. Davis, while granting Mr. Davis' accuser an audience with the AFCU President and CEO, and another AFCU officer;

- Mr. Callan notifying Mr. Davis of the false allegations of "misconduct" against him in the presence of Odis Graham, in order to humiliate Mr. Davis;

- Mr. Callan threatening Mr. Davis that if he did not meet the minimum production requirements by the end of the month that he would need to look for another job, while non-African-American colleagues were not similarly threatened and were not terminated when not meeting production goals;

- Failing to provide support to Mr. Davis as was provided to his non-African-American colleagues;

- Mr. Callan encouraging Mr. Davis' non-African-American colleagues to pursue further certifications in the industry, while ignoring Mr. Callan's requests for the same and discouraging Mr. Davis from pursuing further certifications;

- Mr. Callan questioning whether Mr. Davis had properly completed his work assignments, even though evidence clearly showed Mr. Davis had done so;

- Accusing Mr. Davis (and only Mr. Davis) of failing to obtain pre-authorization to work from home, when Mr. Callan was fully aware Mr. Davis (and others) had been working from home;

- Placing Mr. Davis on "temporary administrative leave" pending an investigation, without telling Mr. Davis what was being investigated, or who would be interviewed in connection with the investigation;

13

- Terminating Mr. Davis (and only Mr. Davis) for working remotely without authorization;

- AFCU refusing to allow Mr. Davis to take his personal client files with him after his termination, which he had brought with him to AFCU as his personal book of business, including when his personal clients called AFCU for Mr. Davis;

- AFCU failing to notify all of Mr. Davis' personal clients that Mr. Davis was no longer employed at AFCU; and

- AFCU making false statements to the Virginia Employment Commission so that Mr. Davis' claim for unemployment benefits was denied.

59. Non-African-American/Black employees were not subjected to similar treatment.

60. Defendant's discriminatory treatment of Mr. Davis violated Title VII of the Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

61. In discriminating against Mr. Davis in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Davis .

62. As a direct and proximate result of Defendant's actions, Mr. Davis has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

63. Due to the conscious disregard for Mr. Davis' federally protected rights, and the severity of Defendant's conduct, Mr. Davis is also entitled to punitive damages.

## COUNT TWO –
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
## IN THE COURSE OF EMPLOYMENT IN VIOLATION OF THE
## VIRGINA HUMAN RIGHTS ACT/VIRGINIA VALUES ACT

64.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

65.     Defendant discriminated against Mr. Davis, treated Mr. Davis in a disparate manner, and subjected Mr. Davis to a hostile work environment because of his race (African-American/Black), in violation of Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

66.     Acts of discrimination include:

- Ignoring Mr. Davis' request for a territory that would not cause him to be isolated from the rest of the team or exclude him from having an office at headquarters, and instead, isolating him from the rest of the team and not allowing him to have an office at headquarters;

- AFCU and Mr. Callan failing to conduct any branch training for Mr. Davis as was done for his Caucasian/non-African-American colleagues;

- Refusing Mr. Davis' requests for an RSA token despite the fact that his Caucasian/non-African-American colleagues were given access to RSA tokens;

- Mr. Callan continuously pressuring Mr. Davis about production numbers despite the fact that each year (prior to the pandemic) Mr. Davis finished as one of the top Advisors;

- Mr. Callan repeatedly questioning and micro-managing Mr. Davis' work, even when Mr. Davis was doing it correctly and following Mr. Callan's explicit directions;

- Mr. Callan taking almost two years to pronounce Mr. Davis' name correctly;

- Mr. Callan "accidently" leaving Mr. Davis' name off of handouts/agendas from monthly department meetings;

- Mr. Callan questioning Mr. Davis when Mr. Davis requested sick time, forcing Mr. Davis to share personal details with Mr. Callan;

- Mr. Callan giving Mr. Davis a hard time about taking sporadic time off during the six months his mother was hospitalized before her 2018 passing;

- AFCU failing to follow company policy and protocol to conduct a proper investigation into a false complaint of harassment against Mr. Davis, which was based on racial profiling, and subjecting him to an unwarranted and unjustified write-up in his personnel file;

- Not allowing Mr. Davis a chance to defend himself and disprove the false allegations, which were taken as truth, with no investigation and without interviewing Mr. Davis, while granting Mr. Davis' accuser an audience with the AFCU President and CEO, and another AFCU officer;

- Mr. Callan notifying Mr. Davis of the false allegations of "misconduct" against him in the presence of Odis Graham, in order to humiliate Mr. Davis;

- Mr. Callan threatening Mr. Davis that if he did not meet the minimum production requirements by the end of the month that he would need to look for another job, while non-African-American colleagues were not similarly threatened and were not terminated when not meeting production goals;

- Failing to provide support to Mr. Davis as was provided to his non-African-American colleagues;

- Mr. Callan encouraging Mr. Davis' non-African-American colleagues to pursue further certifications in the industry, while ignoring Mr. Callan's requests for the same and discouraging Mr. Davis from pursuing further certifications;

- Mr. Callan questioning whether Mr. Davis had properly completed his work assignments, even though evidence clearly showed Mr. Davis had done so;

- Accusing Mr. Davis (and only Mr. Davis) of failing to obtain pre-authorization to work from home, when Mr. Callan was fully aware Mr. Davis (and others) had been working from home;

- Placing Mr. Davis on "temporary administrative leave" pending an investigation, without telling Mr. Davis what was being investigated, or who would be interviewed in connection with the investigation;

- Terminating Mr. Davis (and only Mr. Davis) for working remotely without authorization;

- AFCU refusing to allow Mr. Davis to take his personal client files with him after his termination, which he had brought with him to AFCU as his personal book of business, including when his personal clients called AFCU for Mr. Davis;

- AFCU failing to notify all of Mr. Davis' personal clients that Mr. Davis was no longer employed at AFCU; and

- AFCU making false statements to the Virginia Employment Commission so that Mr. Davis' claim for unemployment benefits was denied.

67. Defendant was motivated to treat Mr. Davis in a disparate manner and to discriminate against him because of his race, and such discriminatory treatment of Mr. Davis was in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

68. Non-African-American/Black employees were not subjected to similar treatment.

69. In discriminating against Mr. Davis in violation of the law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Davis.

70. Mr. Davis has suffered and continues to suffer emotional distress and physical injury. Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

71. Due to the conscious disregard for Plaintiff's statutorily protected rights, and the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JON E. DAVIS requests that this Court enter judgment in his favor, and against the Defendant APPLE FEDERAL CREDIT UNION, on the above stated Counts; and further:

(a) Award Mr. Davis compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One and Two; and in addition

(b) Award punitive damages to Mr. Davis on Counts One and Two in the amount of $350,000 (the statutory cap in Virginia); and in addition

(c) Award Mr. Davis attorneys' fees and the costs of this action; and in addition

(d) Award injunctive relief consisting of an order prohibiting Defendant from engaging in further employment practices that create or tolerate a discriminatory and retaliatory work environment; and in addition

(e) Award Mr. Davis such other and further relief as may be appropriate under the circumstances.

## **JURY DEMAND**

PLAINTIFF JON E. DAVIS DEMANDS A TRIAL BY JURY.

November 17, 2022                    Respectfully submitted,

*/S/  CARLA D. BROWN*
Carla D. Brown, VSB No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
  BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Jon E. Davis*